**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 97-30969**

---

**TOC RETAIL, INC.,**

> **Plaintiff - Counter Defendant - Appellant**
> **Cross-Appellee,**

**VERSUS**

**GULF COAST OIL COMPANY OF MISSISSIPPI, INC., ET AL.,**

> **Defendants,**

**VINCENT PACIERA, Individually d/b/a Gulf Coast Properties;**
**LENA P. LENA (LEE) P. ROMAGUERA TRUST NO. 3, erroneously**
**sued as The Lena Lee Romaguera Trust; VINCENT PACIERA, JR.;**
**KIRTH M. PACIERA; LENA P. ROMAGUERA,**

> **Defendants - Counter Claimants - Appellees**
> **Cross - Appellants,**

**VERSUS**

**TENNECO OIL COMPANY; AMERICAN GAMING CORPORATION;**
**AMGAM ASSOCIATES,**

> **Counter Defendants - Appellees.**

---

Appeal from the United States District Court
for the Eastern District of Louisiana
(94-CV-1949-L)

---

March 25, 1999

Before REYNALDO G. GARZA, JONES, and DeMOSS, Circuit Judges.

DeMoss, Circuit Judge:[*]

---

[*]    Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

This diversity case requires the Court to interpret a long-term lease covering a parcel of commercial property adjacent to the Gulf Coast in Biloxi, Mississippi. The parties sued each other to determine whether the terms of the lease permitted the lessee, TOC Retail, Inc. (TOC), to unilaterally capture financial benefits associated with the advent of gambling along the Mississippi coast by (1) demolishing existing improvements appurtenant to the property's use as a retail service station, (2) repaving the property for use as a casino parking lot, and (3) subleasing the property for that purpose. The district court entered judgment in favor of the lessors, Vincent Paciera, Vincent Paciera, Jr., Kirth M. Paciera, Lena P. Romaguera, the Lena P. Romaguera Trust No. 2, and the Lena P. Romaguera Trust No. 3 (the Pacieras), finding that TOC breached the lease by subleasing for an impermissible purpose and by demolishing existing service station improvements on the property without any purpose to construct more modern improvements. Finding no compensable damages arising directly from the breach, the district court constructed an equitable remedy by (1) terminating TOC's lease and the underlying sublease, and (2) ordering TOC to tender proceeds collected under the sublease from the time the property was converted to a parking lot until the time TOC and its sublessee vacated the property. Both parties appealed. This Court affirms.

2

## BACKGROUND

### I.

The material facts are undisputed. For many years prior to 1959, Gulf Coast Oil Company (Gulf Coast) owned, leased, or operated forty-two retail gasoline service stations and service station sites in Louisiana, Mississippi and Alabama. In 1959, Gulf Coast sold its retail service station business to Tenneco Gas Transmission Company (Tenneco). Gulf Coast retained, however, its fee simple ownership of the real property on which some the stations were located, including the parcel of waterfront property in Biloxi, Mississippi that is the subject of this suit. The property was then leased to Tenneco pursuant to a written lease executed in January 1959.[2] When Tenneco took possession the

_____

[2] The legal description of the property is given in the lease as follows:

> Beginning at a point on the South line of West Beach Blvd. where the East line of Magnolia street would intersect if extended; there running East along the South line of West Beach Blvd. a distance of 134 feet, more or less, to the West line of the old Elmer property, lately of Donnersberger and Goodnow; thence running South along the West line of the property of Donnersberger and Goodnow to the Gulf of Mexico or Miss. Sound; thence running in a westerly direction along the remainder of said Miss. Sound to a point that would be the East line of Magnolia street to the point of beginning and all riparian rights of Lessors thereunto.

> The above property is further described as being bounded on the North by West Beach Blvd.; and on the East of the property, now or formerly of Donnersberger, formerly of Baltar,

3

property had certain improvements such as a building, tanks, pumps, canopies, islands, driveways, and signs that facilitated its use as a retail service station, and Tenneco used the property for that purpose.

In January 1971, Gulf Coast and Tenneco entered into another written lease agreement covering the Biloxi, Mississippi property. In November 1983, Gulf Coast and Tenneco amended the 1971 lease. The 1983 amendment extended the lease term and Tenneco's option periods for extending the lease, and increased Tenneco's rental payments. The parties have stipulated that the November 1983 amendment is otherwise not germane to this dispute, and that their arguments must rise or fall on the force of the terms provided in the January 1971 lease.

The January 1971 lease consists of a form lease provided and prepared by Tenneco, together with a one-page typed addenda expanding upon certain terms and a typewritten addition to clause IX on the face of the lease itself. The lease contains the following provisions, the meaning of which is disputed:

III.

Said premises are leased for the purpose of the

on the South by the Channel of the Gulf of Mexico or Miss. Sound and on the West by Magnolia Street if extended South of the Beach Hwy.

And being the same property as conveyed by Clifford P. Turk et ux, to Gulf Coast Oil Company of Mississippi, Inc., by deed recorded in Book #356, pages 178 and 179 of the records in the office of the Chancery Clerk of Harrison County, Mississippi.

4

sale and storage thereon of gasoline, petroleum and petroleum products, as well as a general merchandising business, and at LESSEE'S option for the conduct of any other lawful business thereon.

VI.

It is understood and agreed that LESSEE may, at LESSEE'S option construct or cause to be constructed certain buildings, driveways, sidewalks, and other improvements as it deems necessary, and that said buildings, driveways, sidewalks, and other improvements shall remain the property of LESSEE during the term of this Lease. At the final termination of this Lease, said buildings, driveways, sidewalks, and other improvements, except LESSEE'S equipment and trade fixtures, shall become part of the realty and title thereto shall pass to LESSOR.

IX.

LESSEE shall have the right and privilege to assign this Lease or sublet said premises, in whole or in part, for the whole or any part of the term of this Lease, or any extension thereof, upon such terms as it shall deem best*, but shall not be relieved of its obligations hereunder.* (italicized language added by parties at execution).

The typewritten addenda contains the following relevant provision:

VIA.

LESSEE shall have the right, but not the obligation, to demolish any and all existing structures now or hereafter situated on the premises for the purpose of constructing more modern improvements at LESSEE'S sole expense.

The parties have stipulated that the 1971 lease does not require TOC to continuously operate a retail service station on the premises. The parties have further stipulated that the lease does not expressly require that the lessee replace improvements demolished by the lessee within any particular time period.

In 1986, Tenneco exercised its rights under clause VIA, the

5

demolition clause, by removing the older service station improvements on the property and constructing a new service station and convenience store. Tenneco paid approximately $440,000 for the 1986 improvements.

## II.

In 1988, Gulf Coast was liquidated, and the ownership of Gulf Coast's property passed to Gulf Coast's stockholders, the Pacieras. Also in 1988, Tenneco assigned its interest in the subject property to TOC, a wholly owned subsidiary of Tenneco, which also operated retail service stations and truck stops. In September 1989, TOC exercised its option to renew the lease for an additional fifteen-year period, through December 2004. In July 1992, TOC was acquired by E-Z Serv Corporation. TOC remains a separate, but wholly owned, subsidiary of E-Z Serv Corporation.

## III.

In 1992, dockside gambling became legal in Biloxi, Mississippi and several entities began trying to develop the waterfront. The American Gaming Corporation (American Gaming) was in the process of developing the Gold Coast Casino, which was to be operated as a gambling operation near the Biloxi, Mississippi property that is the subject of this dispute.

At the same time, TOC was exploring ways to capitalize on the increased demand for the property by gambling interests. In July 1993, TOC exercised its right to sublease pursuant to clause IX by

6

granting American Gaming a sublease in the subject property. The sublease is expressly conditioned upon a timely determination of practicability with respect to the proposed casino, and provides that sublessor, TOC, may continue to conduct its own business activities on the property pending that determination. The sublease further provides that American Gaming intends to use the property as an appurtenance to dockside gambling, which may include use as a parking or similarly related accommodation.

The sublease provides for the collection of "basic rent" in the amount of $3,750 per month, escalating to $4,250 should the sublessee exercise an optional right to extend the sublease. The parties have stipulated that the basic rent payable to TOC under the sublease was significantly below the market rental rate for the property. Nonetheless, at the time of the sublease, the $3,750 to be collected as basic rent from American Gaming was $1,250 in excess of the $2,500 monthly payment that TOC was obligated to make to the Pacieras. The sublease also provides that American Gaming will pay TOC "additional rent" in the amount of $850,000 to compensate TOC for terminating its own business activities on the property.

TOC continued to operate the site as a retail service station until April 1994. In April 1994, TOC removed its equipment and trade fixtures from the property. Shortly thereafter, TOC caused the existing improvements on the property to be demolished, and had the property paved, curbed and stripped for American Gaming's use as a parking lot.

TOC did not provide the Pacieras with any notice of its intent to destroy existing improvements prior to the time those improvements were razed in April 1994. Internal TOC correspondence, which was filed with the parties' stipulations, reflects that TOC acted with the belief that clause III, the use clause, permitted TOC to operate a retail service station on the premises, but otherwise imposed no restriction upon TOC's lawful use of the property. TOC further believed that its conversion of the property to use as a parking lot constituted demolition "for the purpose of constructing more modern improvements" within the meaning of clause VIA, the demolition clause. Thus, when challenged by the Pacieras, TOC asserted its position that it was entitled under the terms of the lease to convert the property to use as a parking lot and to sublease to American Gaming for that purpose. Shortly after the improvements were destroyed, the Pacieras made their contrary position known by providing written notice that TOC's conversion of the property to use as a parking lot breached the lease, and this litigation ensued.

IV.

TOC sued first, seeking a declaratory judgment that it acted within its rights under the lease. The Pacieras counterclaimed against TOC, Tenneco and American Gaming, alleging that TOC's actions constituted a material breach of the lease. The Pacieras also sought to have the 1971 lease and the 1993 sublease

8

terminated, and to have a constructive trust imposed upon the payments TOC received from American Gaming in their favor.

The issue of liability was decided on cross-motions for summary judgment, which were submitted with a joint stipulation of the controlling facts. The district court concluded that the relevant provisions of the lease did not permit TOC to demolish existing improvements for the purpose of constructing a parking lot or to sublease for that purpose. TOC appeals the district court's interpretation of the relevant lease provisions.

The issue of remedy was tried before the district court without a jury, once again on the basis of stipulated facts, as supplemented by certain documentary exhibits, and the depositions of each party's damage expert. The district court found that, as of the time of trial, TOC's breach had greatly enhanced the value of the property. There were, therefore, no compensable damages. The district court nonetheless fashioned an equitable remedy, terminating the Gulf Coast/Tenneco main lease and the TOC/American Gaming sublease, and ordering TOC to tender to the Pacieras all proceeds collected under the sublease as rent from the time the property was converted to a parking lot on or around May 1, 1994, until the time TOC and American Gaming vacated the property. The district court declined, however, to award any penalty or incidental damages arising from TOC's breach because the breach itself greatly improved the value of the property, which benefit would inure to the aggrieved owner, the Pacieras. In addition, the district court declined to require TOC to tender sums it received

under the sublease from September 15, 1993, the effective date of the sublease, through May 1, 1994, the date that TOC's conversion of the property to use as a parking lot was complete. As a result, TOC was permitted to retain $850,000, which was paid by American Gaming to TOC under the sublease as consideration for TOC's agreement to terminate its business operations on the property, as well as basic rent payments for the period from September 1993 through May 1994.

Both TOC and the Pacieras appeal the district court's decision terminating the lease. TOC argues that the Pacieras are not entitled to any relief in the absence of provable damages. The Pacieras argue that they presented sufficient evidence to support an award of substantial damages.

We review the district court's interpretation of the relevant lease agreements de novo. *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.*, 154 F.3d 202, 205 (5th Cir. 1998). We review the district court's underlying factual findings for clear error only. *Id*. at 207. Under the dictates of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938), and its progeny, the outcome of this diversity case is governed by Mississippi law.

### DISCUSSION

#### I.

Two clauses of the lease are dispositive on the issue of TOC's liability. Clause III, the use clause, provides that the "premises are leased for the purpose of the sale and storage thereon of

10

gasoline, petroleum and petroleum products, as well as a general merchandising business, and at LESSEE'S option for the conduct of any other lawful business thereon." The parties disagree, as they did below, about the meaning of this clause.

TOC argues that the use clause is intended to be entirely permissive. Thus, in TOC's view, the first portion of the clause merely recognizes that TOC may operate a service station and convenience store. TOC maintains that the second portion of the clause expands upon that specified usage by permitting TOC to conduct "any lawful business," whether in lieu of or in addition to a service station and convenience store. The Pacieras disagree, arguing that the first portion of the clause sets forth the parties' intention that the property be used as a service station and convenience store, while the second portion of the clause is permissive in that it allows TOC to conduct any other lawful business in addition to, rather than in lieu of, a service station and convenience store. The parties agree that TOC's right to sublease for a particular use is only as broad as its own rights under the main lease. Thus, whether TOC was entitled to sublease for use as a parking lot depends upon the interpretation given to clause III.

We consider first the effect of the specified use in clause III. The clause provides that the property is being leased for "the purpose of the sale and storage thereon of gasoline, petroleum and petroleum products, as well as a general merchandising store." TOC argues that Mississippi law construes a specified use in a

11

lease provision to be permissive rather than restrictive unless the lease contains unambiguous language of limitation stating that the specified use is the "only" or "sole" permissible use.  We agree that restrictive use clauses are disfavored in Mississippi.  *See*, *e.g.*, **Delta Wild Life & Forestry, Inc. v. Bear Kelso Plantation, Inc.**, 281 So. 2d 683, 686-87 (Miss.  1973).  Thus, we decline to construe the lease in a manner that would make a retail service station and convenience store the *only* permissible use under the lease.

That does not mean, however, that the words specifying the purpose of the lease and the use to which the property is to be placed are of no import at all.  Indeed, the Mississippi Supreme Court addressed the effect to be given a specified use in the absence of restrictive language in **Ewing v. Adams**, 573 So. 2d 1364 (Miss. 1990).  **Ewing** involved a commercial lease which provided that property was being leased for use as a drive-in movie theater. *Id*. at 1365-66.  A separate provision of the lease provided that the lessee was not to use the property for any "business deemed unlawful."  *Id*. at 1366.  The lessee permitted the premises to be used inter alia as a flea market, and was alleged to have kept the property in poor repair.  *Id*. at 1367.  The matter ended up in litigation, with the lessor claiming that the specified use as a drive-in movie theater prohibited any alternative use, and the lessee claiming that the specified use was entirely permissive and imposed no limitation upon the lessee's use of the property, aside from the requirement that the use be lawful.  *See id*.

12

The Mississippi Supreme Court held that both parties were wrong about the scope of permissible use. The Court first reviewed the general principles applicable to the interpretation of restrictive clauses, noting that such clauses are disfavored. *Id*. at 1368. The Court reaffirmed its prior holding in **Delta Wild Life & Forestry**, that mere specification of the intended use does not, under Mississippi law, effectively preclude all other uses by the lessee. **Ewing**, 573 So. 2d at 1368. The Court therefore rejected the lessor's position that the specification of the intended use precluded all other uses. *Id*. at 1369.

The Court next considered the lessee's position, that the specified use imposed no limitation at all. The Court rejected this position as well, holding that the specification of a particular use may be construed as defining the general scope of permissible uses by the lessee. *Id*. Thus, the Court concluded that the parties' specification that the property was being leased for use as a drive-in movie theater permitted the specified use and those additional unspecified uses that were similar to or related to use as a drive-in movie theater. *Id*. at 1369-70.

The district court properly relied upon **Ewing**, finding that TOC's use of the leased premises as a parking lot was neither similar to nor related to its use as a service station and convenience store. Thus, the district court concluded that the parties did not contemplate, and did not intend to authorize the property's use as a parking lot.

**Ewing** dispenses with the need to make an **Erie**-guess. Although

13

a specified purpose or use in a commercial lease may not be construed as restricting the lessee to that distinct use absent unambiguous language of limitation, a specified use or purpose will be given some meaning in terms of defining the general scope of permissible uses under the lease absent unambiguous language indicating that no such limitation is intended. Applying that principle to this case, we conclude, as did the district court, that TOC's sublease of the property for use as a parking lot was neither similar to nor related to the specified use of the property as a service station and convenience store.

Neither does the final phrase of clause III, permitting additional usage for the conduct of "any other lawful business," permit completely unfettered usage by TOC. Clause III provides that the property is being leased for the specified purpose, the sale of petroleum products as well as a general merchandising store, "*and* at LESSEE'S option for the conduct of any other lawful business thereon" (emphasis added). The use of the connector "and" following the specified purpose is not without significance. TOC's interpretation of the clause essentially requires that we insert the word "or" in place of the word "and," such that the clause would read that the property is being leased "for the purpose of the sale and storage thereon of gasoline, petroleum and petroleum products, as well as a general merchandising business, or at LESSEE'S option for the conduct of any other lawful business thereon." We decline to redraft the contract for the parties by substituting a disjunctive connector for the conjunctive connector

14

Tenneco placed in its own lease form. We therefore conclude that the final phrase of clause III does not free TOC from the scope of permissible uses generally defined by the first portion of clause III. TOC's sublease to American Gaming, which permitted use as a parking lot, breached clause III by dedicating the property to an impermissible use.

Even if we were persuaded by TOC's reading of the use clause, we would still find that TOC breached the lease. Clause VIA provides that TOC can demolish existing structures, but only for the purpose of constructing "more modern" improvements on the property. While there is no time limitation imposed by the contract for the construction of more modern improvements, the record is clear that TOC had no intention to rebuild the service station or any other "more modern" improvements consistent with the stated purpose of the lease in clause III. TOC's argument that the parking lot is more modern simply because it produced more income to TOC is unavailing. TOC's destruction of the service station for the purpose of erecting a parking lot constitutes an independent breach of clause VIA.

In sum, we agree with TOC that the specified use is not preclusive, in that alternative uses that are similar to the specified use may have been contemplated by the parties. We decline, however, to hold that the language specifying the purpose of the lease is without legal effect. The language specifying a particular use permitted TOC's use for purposes similar to or related to the specified use only. Moreover, the final phrase of

clause III does not obviate the meaning of the first phrase by permitting unfettered use. Rather, the second phrase merely permits the conduct of another lawful business in addition to, rather than in lieu of, a service station and convenience store. We therefore affirm the district court's legal conclusion that TOC breached the lease.

## II.

Having concluded that TOC breached the lease, we proceed to consideration of the appropriate remedy for TOC's breach. During the liability phase of the case, the Pacieras argued that they were damaged by TOC's breach because TOC's wrongful conduct caused the property to lose its non-conforming use status under Biloxi, Mississippi zoning ordinances. The Pacieras submitted evidence that Biloxi, Mississippi passed zoning ordinances in 1992 that prohibited the operation of a service station in the area where the subject property was located. The subject property was excluded from application of the zoning ordinances, however, because it was operating as a service station when the zoning ordinances were passed. Under the applicable ordinances, the property's exclusion from the zoning ordinance, or non-conforming use status, would lapse if there was a cessation of that use for more than six months. TOC stopped using the property as a service station for more than six months. Thus, the property became subject to the city's ordinances and, on the basis of currently applicable zoning

16

ordinances, could not be operated as a service station when the lease expires in 2004. The Pacieras claimed that this resulted in a diminishment of their reversionary interest under the lease.

During the remedy phase of the case, however, the Pacieras' own expert testified that the property was worth much more as a parking lot than it would be as a service station. Indeed, the record reflects that the property was worth approximately $740,000 with improvements as a service station and convenience store when it was converted to a parking lot. After that conversion, the same expert valued the property at between $2 million and $2.7 million dollars. Moreover, the parties agree that to the extent such values can be estimated, the highest and best use of the property will most likely be gambling-related through 2004, when the lease would have otherwise expired and the Pacieras would have reclaimed their reversionary interest. Thus, the Pacieras' own evidence tends to establish that the value of their reversionary interest was enhanced, rather than diminished, by TOC's breach.

Recognizing this potential deficiency in their position, the Pacieras offered a host of new damage theories at the remedy phase of the case. In most articulations of those theories, the Pacieras have shifted their focus from the loss of non-conforming status under Biloxi zoning laws, to losses arising from TOC's usurpation of an incorporeal right that was vested with the Pacieras. The wrongful conduct identified is TOC's exercise of a right not ceded to TOC during the pendency of the lease, with resulting harm to the Pacieras' right to control the use and development of the property

17

at the termination of the lease in 2004.

TOC complains about the Pacieras' change of strategy at the remedy phase, and particularly about the district court's reliance upon the loss of non-conforming status as evidence of harm in its liability decision. TOC cites this reliance as error, arguing that the district court's liability decision implicitly requires TOC to continuously operate a service station on the premises. The parties have stipulated that the lease does not contain a continuous operation clause.

We disagree with TOC's interpretation of the district court's decision. TOC could have ceased business operations of any sort on the premises. It may even be that TOC could have discontinued business operations, and then demolished existing structures with the intent of rebuilding more modern improvements within the scope of reasonably anticipated use shortly before the lease expired. But that is not what happened in this case. TOC made an economic decision to unilaterally capture the financial benefit associated with increasing property value as a result of the gambling boom along the Mississippi coast. While TOC owned certain leasehold rights, the lease did not grant TOC the right to unilaterally capture that benefit by dramatically changing the property's use beyond that contemplated by the parties. The district court denied TOC's motion in limine to exclude the Pacieras' various damage theories as untimely and improperly raised, finding that those theories were properly within the scope of the pretrial order.

18

Although only indirectly challenged by TOC, we find no error with the district court's decision to consider the Pacieras' various damage theories during the remedy phase of the case.

The Pacieras repeat their damage theories, with some new elaborations, on appeal. The Pacieras first argue that they should recover the value of the right wrongly exercised by TOC. The problem with this approach is two-fold. First, it assumes that the right to control the use and development of the property for gambling-purposes during the pendency of the lease was vested, in whole, with some party and can be ascribed some certain value. That is simply incorrect. Under the terms of the contractual arrangement between these parties, neither the Pacieras nor TOC possessed the unilateral right to capitalize upon the gambling boom. Second, TOC's breach caused a substantial increase in the value of the Pacieras' reversionary interest. Thus, to the extent TOC wrongfully controlled the use of the property during the pendency of the lease, or interfered with the Pacieras' development of the property in 2004, the Pacieras appear to have benefitted rather than suffered financially as a result of TOC's breach.

Alternatively, the Pacieras argue that the value of the right usurped may be measured by the amount "which they did not but would have received if they had been able to exercise" that right. This theory is hinged upon the premise that the Pacieras, while they benefitted financially, did not benefit as much as they should have or could have if TOC had negotiated to split the proceeds of the gambling boom with the Pacieras. The problem with this approach is

19

that it requires the Court to decide, as a matter of fact, what the result of those negotiations would have been, and then to compensate the Pacieras based upon a similarly hypothetical allocation of the proceeds arising from those negotiations. The district court correctly declined to engage in such an exercise, and we will not do so on appeal.

Regardless of how the damages are calculated, the Court is led to the inevitable conclusion that the value of the Pacieras' interests in the property greatly increased as a result of TOC's breach. Mississippi embraces the recognized precept that the law will not place one injured by a breach of contract in a better position than he or she would have occupied in the absence of the breach. *E.g.*, **Polk v. Sexton**, 613 So. 2d 841, 844 (Miss. 1993). To the extent the Pacieras failed to profit as they might have absent TOC's breach, the record does not contain an objective basis upon which that differential in profit can be ascertained with reasonable certainty. *See* **Burnham v. Joseph**, 482 So. 2d 1151, 1153 (Miss. 1986) (Mississippi law requires that damages be shown with reasonable certainty; damage awards may not be based upon mere speculation or conjecture). Having reviewed the entire record, we agree with the district court that, notwithstanding an imaginative array of theories and a voluminous record of expert testimony, there is simply no basis for finding that the Pacieras suffered any monetary damage that is compensable under Mississippi law. The district court's decision that monetary damages are inappropriate in this case is therefore affirmed.

20

III.

The Pacieras argue in the alternative that the district court should have imposed a constructive trust in their favor upon the proceeds TOC received from American Gaming, including the $850,000 lump sum payment collected as "additional rent." A constructive trust is a "fiction of equity" that must be established with clear and convincing evidence. *Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.*, 716 So. 2d 200, 207 (Miss. 1998). A constructive trust arises by implication of law against "'one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.'" *Id*. (quoting *Sojourner v. Sojourner*, 153 So. 2d 803, 807 (Miss. 1963)). The trust operates to compel the party wrongfully in possession of the property interest to convey that interest to the party to whom it justly belongs. *Id*. (quoting *Allgood v. Allgood*, 473 So. 2d 416, 421 (Miss. 1985)). These cases often involve an abuse of trust or confidential relationship that permitted the wrongdoer to gain possession of the property interest. Many courts have given flavor to this aspect of a constructive trust by holding that there must be a confidential or fiduciary relationship between the wrongdoer and the victimized party. The Pacieras argue that Mississippi does

21

not require proof of a confidential or fiduciary relationship. The Pacieras support this proposition with cases they cite as imposing a constructive trust upon a purely commercial relationship. *E.g.*, **Planters Bank & Trust Co. v. Sklar**, 555 So. 2d 1024 (Miss. 1990). We disagree. The cases cited by the Pacieras are distinguishable, and invariably involve either an abuse of trust by one acting on behalf of another's interests or the wrongful retention of funds by a party which has actual knowledge of a superior right to the funds. *E.g.*, ***id***. at 1034. The Mississippi Supreme Court has expressly held that the "mere relation of landlord and tenant alone" is not the type of relationship that supports imposition of a constructive trust. **Risk v. Risher**, 19 So. 2d 484, 486 (Miss. 1944). "Something more is needed." ***Id***. This case lacks that "something more." *See also* **Demyers v. Demyers**, No. 97-CA-01040-SCT, 1999 WL 4828, at *3 (Miss. Jan 7, 1999) (affirming refusal to impose a constructive trust because the proponent failed to meet his burden of establishing that a confidential relationship existed between the wrongdoer and the prospective beneficiary of the constructive trust). We find no Mississippi cases supporting the Pacieras' remarkable position that a constructive trust can be imposed in the absence of any circumstances in which equity require that TOC tender the funds to the Pacieras. *See also* **Lipe v. Souther**, 80 So. 2d 471, 475 (Miss. 1955) (imposition of a constructive trust requires proof of a confidential relationship as well as an abuse of the confidence imposed). There is no basis for imposing a constructive trust in the Pacieras' favor upon funds TOC

22

collected as a matter of its separate negotiations with American Gaming, and the district court's decision declining to impose a constructive trust is affirmed.

IV.

After rejecting both monetary damages and constructive trust, the district court considered what equitable remedies were available to redress TOC's wrongful conduct. The district court settled upon termination of the lease and the sublease. On appeal, the Pacieras reinforce their preference for monetary damages by pointing out that termination is a disfavored remedy when there are provable damages for breach. *See, e.g., Cenac v. Murry*, 609 So. 2d 1257, 1273-74 (Miss. 1992); *Southwest Gas Producing Co. v. Seale*, 191 So. 2d 115, 122 (Miss. 1966). TOC goes further, citing cases from other jurisdictions for the proposition that the lease contract may not be terminated unless that remedy is expressly reserved in the contract. We disagree. Mississippi law has always made termination an available contract remedy for material breach. *Olin Corp. v. Central Indust., Inc.*, 576 F.2d 642, 646-48 (5th Cir. 1978) (noting that termination and rescission has always been an available remedy for material breach under Mississippi contract law); *see also Cenac*, 609 So. 2d at 1273 (citing *Olin* for the same proposition). A material breach is one that substantially defeats the purpose of the contract. We have no trouble concluding that TOC's demolition of existing improvements with no purpose to erect more modern improvements constituted a material breach. Further,

23

the Pacieras prayed for termination of the lease and sublease in their complaint alleging counterclaims against TOC and American Gaming. While we agree with the Pacieras that the equitable remedy of termination is less desirable where damages will suffice, we can find no error in the district court's factual findings or in its legal conclusion that no compensable damages were shown. Indeed, the district court did an admirable job of sorting out the complex web of damage theories and expert testimony. In sum, termination is an available remedy under Mississippi law and is appropriate on the facts of this case.

The district court held that TOC's breach was complete on May 1, 1994, the date the property was converted to a parking lot. Therefore, the district court terminated the lease and sublease as of that date. In addition to terminating the leases, the district court also ordered TOC to pay to the Pacieras any proceeds received from American Gaming under the sublease between May 1, 1994 and the date that TOC and American Gaming vacated the property.

The Pacieras filed a motion for reconsideration, arguing that the appropriate date for termination was the date TOC and American Gaming entered into the sublease, rather than May 1, 1994 when the property was converted to a parking lot. The district court denied that motion, holding that TOC's breach, and the harm to the Pacieras was not complete until the property was converted to use as a parking lot on or about in May 1, 1994. The Pacieras challenge this decision again on appeal. With this argument, the Pacieras seek, not only additional sums collected as basic rent,

but the $850,000 American Gaming paid to TOC as compensation for TOC's cessation of business.

We agree that TOC lacked any right to sublease the property for a purpose other than the purpose prescribed in the sublease. Once that sublease was signed, and TOC began collecting basic rent, TOC was in violation of the lease. However, TOC's breach of the sublease provision is not, under Mississippi law, a material breach that can give rise to the remedy of termination in the absence of express contractual or statutory language permitting that remedy. Rather, the material breach did not occur until TOC performed under the sublease by demolishing the existing improvements with no intention of constructing more modern improvements and by dedicating the property to a use that substantially defeated the stated purpose of the lease contract. For that reason, we affirm the district court's decision terminating the lease as of May 1, 1994.

We likewise reject the Pacieras' argument that they are entitled to recover the $850,000 received by TOC as "additional rent." The district court's decision constitutes an equitable resolution of the competing concerns. To the extent that TOC wrongfully attempted to unilaterally develop the property for use as a gambling accessory, the district court's decision divests TOC of the control and benefit of its wrongful conduct by returning control of the property to the Pacieras or their successors. TOC is further divested of the benefit of monthly rent collected after its material breach of the sublease. The subleasee, American

25

Gaming, cannot be heard to complain of this transfer because it enjoyed the use of the property during the relevant time period.

Without regard to what portion of the $850,000 may eventually be returned to American Gaming as a consequence of the sublease's failure, the Pacieras have not articulated any theory under which they would be entitled to both the financial benefits of TOC's breach and the funds expended to yield that benefit. The district court's conclusion that the material breach occurred on or about May 1, 1994 and denying the Pacieras' recovery of the sum paid by American Gaming to TOC as "additional rent" under the sublease is affirmed.

V.

We close with a note about the identity of the parties. After this suit was filed, American Gaming sold its casino and went into bankruptcy. American Gaming's leasehold interests have since been purchased out of bankruptcy by another gaming enterprise, American Casino Entertainment Services, Inc. In addition, the Pacieras have sold their interests in the property to a different gaming venture, Full House Resorts, Inc.

The Pacieras have filed a motion to substitute Full House Resorts, Inc. in their place for purposes of this appeal. The motion is opposed by TOC, which claims that substitution is unnecessary and may have unintended effects. The various contracts of sale between the parties are not before the Court. Therefore, the extent to which the alleged successors in fact succeeded to the

26

full panoply of the Pacieras' interests cannot be determined on appeal.

Federal Rule of Appellate Procedure 43 governs substitution of parties on appeal. That provision permits substitution when it is "necessary." The vast majority of rule 43 cases deal with substitution necessitated by the death of a party pursuant to subpart 43(a), or substitution necessitated by a change in the person occupying a public office pursuant to subpart 43(c). The provision applicable here, subpart 43(b), is cited in only a handful of cases. The Court has not found any federal case granting substitution on appeal when, as here, the motion is strongly opposed by the adversary party, and the extent to which there has been a succession of interests is disputed. Moreover, it does not appear that substitution is "necessary" to the Court's judgment. Federal Rule of Appellate Procedure 43(b) is based upon Federal Rule of Civil Procedure 25. *Glickstein v. Sun Bank/Miami, N.A.*, 922 F.2d 666, 672 n.10 (11th Cir. 1991). Federal Rule of Civil Procedure 25(c), like Federal Rule of Appellate Procedure 43(b), permits the district court to order a substitution of parties when there has been a transfer of interest. That provision also provides, however, that "the action may be continued by or against an original party" after a transfer in interest. *See* FED. R. CIV. P. 25(c). The judgment of the district court, which is affirmed by this opinion, can be enforced by the parties' successors to the extent appropriate under the terms of the various contracts. We decline to sort out the effect of the various

27

transfers in interest on appeal. The Pacieras' motion to substitute Full House Resorts, Inc. as the real party in interest is therefore denied.

For the foregoing reasons, the district court is AFFIRMED.

EDITH H. JONES, Circuit Judge, dissenting:

I respectfully dissent from the majority's conclusion that TOC breached its lease with the Pacieras. The Pacieras made a deal with TOC, and there is no reason, in law or fact, why they shouldn't be held to it.

The Mississippi Supreme Court has twice set forth the general principles of Mississippi law governing restrictive use clauses in leases. In <u>Delta Wild Life & Forestry</u>, the court ruled that

> a tenant is entitled to use leased premises for any lawful or valid purpose, without interference on the part of the landlord, so long as such use is not forbidden by any <u>express</u> <u>provision</u> of the lease or by some <u>necessarily</u> <u>implied</u> construction of the instrument.

281 So. 2d at 686-87 (emphasis added). Although the <u>Delta Wild Life & Forestry</u> lease contained a clause providing the lessee with the right to use the land for a pasture,[3] the court found that the lease had not been breached when the land was subleased to a third-party for the purpose of clear-cutting trees and raising soybeans.

---

[3]   The <u>Delta Wild Life & Forestry</u> lease contained the following provision:

> LESSEE shall have the right and privilege to put any part or all of said land in pasture, and to erect such fences or other improvements thereon as Lessee may need in and about such operations, and may remove at Lessees (sic) option such fences or improvements at the termination hereof.

281 So. 2d at 684.

29

See id. The Court also held that a court should only find a restriction if the lease unambiguously and expressly identifies a particular activity as the sole permissible use. See id.

Confronted with a similar scenario in Ewing, the court considered arguments that the lessees had breached their contract by operating a flea market on property when the lease allegedly restricted their use to a drive-in movie theater. See Ewing, 573 So. 2d at 1367-70. Interpreting the Ewing lease,[4] the court held that the language neither permitted every potential lawful activity nor necessarily limited the lessees to the operation of a drive-in theater. See id. at 1368, 1369-70. The court noted that "[t]he answer lies somewhere between" the two interpretations and specifically refused to address the scope of potential permissible uses. Id. at 1370 (quoting Bevy's Dry Cleaners and Shirt Laundry, Inc. v. Streble, 208 N.E.2d 528, 532 (Ohio 1965)).

While the majority seizes on Ewing, they overlook the critical difference in lease language in these two cases. Unlike the lease in Ewing, clause III of the TOC-Paciera lease expressly permits the property to be used "at [l]essee's option for the conduct of any other lawful business." (Emphasis added). There is

---

[4]     The Ewing lease contained the following language:

The said premises are demised and leased . . . to be used for a drive-in-movie-theater, with the privilege upon the [lessees] to erect, or construct on the premises before mentioned at their expense such structures and buildings commonly used in connection with the business aforesaid, and incidental thereto.

573 So. 2d at 1365-66.

30

no "somewhere between" permissible and impermissible uses, because TOC's lease expressly contemplated and gave it the option to run any other lawful business on the premises.

The majority reasons that TOC's proffered interpretation would "redraft the contract for the parties by substituting a disjunctive connector for the conjunctive connector" used in clause III. However, not only do courts sometimes interpret "and" to mean "or,"[5] but the majority's reading adds new restrictive language to the lease. In essence, the majority reforms clause III to read "any other lawful business <u>in addition to or related to the sale and storage of gasoline, petroleum, and petroleum products</u>." The majority's interpretation, which imposes a restriction on other lawful uses, itself violates Mississippi law. Mississippi requires that restrictions in leases should be interpreted narrowly against a finding of limitation. <u>See</u> <u>Ewing</u>, 573 So. 2d at 1368 (quoting <u>Forman v. United States</u>, 767 F.2d 875 (Fed. Cir. 1985)). The broadly framed permissive use language of clause III should,

---

[5]     <u>See</u>, <u>e.g.</u>, <u>Varel v. Banc One Capital Partners, Inc.</u>, 55 F.3d 1016, 1019-20 (5th Cir. 1995) (recognizing under Texas rules of construction that "and" may sometimes mean "or"); <u>Bruce v. First Fed. Sav. and Loan Ass'n of Conroe, Inc.</u>, 837 F.2d 712, 715 n.2 (5th Cir. 1988) (noting substitution of "and" for "or" in interpretation of statute when strict grammatical construction would frustrate legislative intent); <u>Ex parte Ruddy</u>, 103 U.S.P.Q. 245, 245-46 (Pat. Bd. App. 1952) ("While the word used here is 'and' and not 'or' it is used in a disconjunctive sense and must be read as equivalent to 'or'."); <u>see</u> <u>also</u>, <u>e.g.</u>, Black's Law Dictionary 86 (6th ed. 1990) (defining "and" as "[a] conjunction connecting words or phrases" but "[s]ometimes construed as "or"); Webster's New International Dictionary 80 (3d ed. unabridged 1976) (defining "and" as "[a] reference to <u>either or both</u> of two alternatives . . . [especially] in legal language when also plainly intended to mean or" (emphasis added)).

according to Mississippi law, be applied as written to permit TOC to operate a parking lot on the premises.  See id.

Offhandedly, the majority implies that TOC breached the modern improvements clause of the lease by destroying the property's service station with "no intention to rebuild."  The parties stipulated, however, that the lease did not require that demolished improvements be replaced within a particular period of time.  By assuming that TOC would never rebuild the improvements, the majority fail to give proper effect to the stipulation.  TOC could have waited until the termination of the lease to rebuild more modern improvements.  Moreover, the majority reject, without basis, TOC's explanation that the parking lot could be construed as a "modern improvement."  See Black's Law Dictionary 757 (6th ed. 1990) (defining improvement as "[a] valuable addition made to property or an amelioration in its condition . . . intended to enhance its value, beauty or utility or to adapt it for new or further purposes" (emphasis added)).  The majority's later discussion on damages proves beyond doubt that the parking lot enhanced the value of the property as did demolition of the gas station.  This is a peculiar breach.

In my view, TOC did not breach its lease by demolishing the improvements on the leased premises, constructing a parking lot, or subleasing the lot for a profit.  TOC's actions were within the permitted uses of the lease and worked no detriment to the lessors' rights thereunder.  That the lessors now seek and have been permitted to capture the benefit of TOC's superior bargain

32

does not alter this fact.  I respectfully dissent.